**UNITED STATES of America,**
v.
**Joseph V. MORIARITY, Appellant.**
**Nos. 14287, 14288.**

United States Court of Appeals
Third Circuit.

Argued Nov. 22, 1963.

Decided Feb. 3, 1964.

Raymond A. Brown, Jersey City, N. J., for appellant.

Sanford M. Jaffe, Asst. U. S. Atty., Newark, N. J. (David M. Satz, Jr., U. S. Atty., on the brief), for appellee.

Before McLAUGHLIN, KALODNER and GANEY.

McLAUGHLIN, Circuit Judge.

Appellant was convicted of being engaged in the business of accepting wagers and failing to pay the occupational tax in connection therewith, in violation of 26 U.S.C. §§ 7262, 7203.

The application for the issuance of the warrant was supported by the affidavits of Irving B. Dubow and A. Joseph Toscano, Special Agents, Intelligence Division, Internal Revenue Service. Both affidavits were executed June 28, 1961. The central problem is whether these affidavits contained sufficient evidence to establish probable cause to search appellant's residence, 18A Hamilton Place, Jersey City, New Jersey. Agent Dubow stated that on September 29, 1960, he had participated in the execution of a search warrant on the same premises, appellant's home. At that time, he stated, "There were seized within, on the upper and lower floors, cartons containing packets of coded current lottery number slips, an adding machine, records, wagering paraphernalia and secreted currency in excess of $50,000.00."

Agent Toscano in his affidavit said that, "Joseph Moriarity has a criminal record dating from at least December

26, 1930 and continuing until July 1960. He was arrested six times for possession of numbers slips and in July 1960, was arrested by Special Agents of the Intelligence Division for conducting a gambling operation in violation of Sections 4401, 4411, and 4412, and 7203, Title 26, United States Code."

Toscano, with " * * * previous experience in investigating wagering activities in many states for the United States Treasury Department, observed appellant on numerous occasions in May and June 1961 in the vicinity of York Street near Van Vorst and Warren Streets, Jersey City, around five o'clock in the afternoon. During that period he often saw a particular woman in various cars being driven into that area and there park. Shortly thereafter appellant, mostly driving a car affiant knew to be his, would appear and drive to the woman's car. The first time affiant observed such action, the woman handed appellant "a white stuffed envelope". The next two times she gave him "a package". Affiant saw similar meetings between the two at least seventeen times between May 19, 1961 and June 21, 1961. Within that same span he " * * saw other male individuals approach Joseph Moriarity and hand him something small or they would get into his car for a short period of time, then leave again. One of those men drove a Tan Dodge car, New Jersey License FSI 613, and he entered Moriarity's automobile at about 5:20 P.M. each day" for eight days in June 1961 while affiant was checking on appellant. On May 24, 1961, affiant observed appellant " * * * taking many stuffed envelopes from large shopping bags and he appeared to be checking the envelopes for notations. Occasionally he would open one of the stuffed envelopes and check it carefully. I saw him do this with three or four large shopping bags partially full of stuffed envelopes."

Agent Toscano said that the above mentioned envelopes and packages " * * * were similar in size to those commonly found in a numbers operation." He stated: " * * * I believe that Moriarity's actions and manner of circuitous driving after he received packages from individuals in cars was like that used by persons engaged in the numbers lottery operation."

On one occasion the above mentioned woman crumpled a small piece of white paper and threw it from her car. Toscano retrieved the paper. It was a piece of adding machine tape. There was an amount printed on it and another amount written in ink. The latter was 25% of the other sum on the tape. Also on the tape was the code mark "C5". Search of the bet slips seized from Moriarity in July 1960 as previously noted revealed one pack with the code "C5" which contained many bet slips that " * * * were similar and appeared to be written by the same person".

On June 2, 1961 Toscano saw Moriarity in an automobile which he had driven on one or more of the above referred to occasions, go to the area of his home at 6:03 P.M., pass his house and turn left at the first intersection. On June 10, 1961 he saw Moriarity in a 1956 black Buick, another of the cars he had used in his mentioned activities, proceeding from the vicinity of his home north on West Hamilton Place. This was about 5:50 P.M. Toscano also says: "On June 22, 1961 from 3:20 P.M. to 3:30 P.M., I saw Moriarity's 1956 Black Buick, New Jersey License FSJ 273, parked on Cole Street near a green fence that leads to the backyard of the house next to his. At 3:30 P.M., I saw Joseph Moriarity come from the direction of his house and get in the aforementioned Buick and drive south on Cole Street, then east on 8th Street, Jersey City, New Jersey."

Agent Dubow described following appellant on June 2, 1961 at 5:05 P.M. from the vicinity of York Street to the Henderson Auto Service Center at Henderson and Seventh Streets. Dubow, in previous wagering surveillances had " * * * observed Moriarity driving and using in his lottery operations, vehicles bearing license plate numbers registered to the Henderson Service Center." After that, at 6:00 P.M. Moriarity proceeded past his residence 18–A West Hamilton Place,

turned left at Pavonia Avenue and stopped between West Hamilton Place and Cole Street. On June 9, 1961 at about 5:50 P.M. Dubow again saw Moriarity proceed slowly past his house and turn left into Pavonia Avenue. On June 16, 1961 at 5:50 P.M. Dubow observed Moriarty drive past his home. On all three of these instances Moriarity drove a 1956 black Buick automobile. On June 3, 1961, Agent Dubow had seen appellant, parked in a 1956 black Buick, directly ahead of a late model tan Dodge automobile in the York Street area. A man was leaning against the Buick and appeared to be conversing with appellant.

From all of the above, both agents stated that they had reason to believe that Moriarity was then using his home as a numbers lottery headquarters and that records, papers, slips, currency, equipment, etc. were concealed there "which were used and are being used in violation of the law in the operation of a lottery contrary to * * *." A search warrant was therefore requested.

What the affidavits present is a solid basis of fact which affords Agent Toscano, experienced and knowledgeable with respect to wagering activities and Agent Dubow who had participated in the execution of the prior and similar search warrant of the appellant's residence, reasonable grounds for believing that appellant was then engaged in operating a numbers lottery and using his residence as its headquarters as he had within ten months previously. Even to a layman, that picture comes up clearly from the matter of fact statements of the agents. Appellant, with a real background in the particular field, had a beautifully simple method of running his lottery. As a matter of daily practice, around five o'clock in afternoon, he would go to a specific part of downtown Jersey City and receive from various individuals small packages "like those used by persons engaged in the numbers racket" as Toscano describes it. Other details, noted primarily in the Toscano affidavit, indicated that Moriarity as principal in a numbers lottery was in those instances collecting numbers slips from his agents. Direct inference from the evidence points to 5:00 P.M. as the approximate dead line for collections. The "C5" mentioned in the Toscano statement, was shown to be an agent's (writer's) code number. The sum in adding machine figures with an amount 25% less noted in ink was interpreted as meaning that the normal 25% of the gross wagers accepted by "C5" had been acknowledged to that agent.

Following the nightly pick ups of the small packages, Moriarity would drive off and take a circuitous course to the immediate vicinity of his home. There was testimony that after the bet slips were collected they had to be tallied so that the principal could pay off the winners that same evening. Toscano had seen Moriarity leave his house around 3:30 in the afternoon. He and Dubow had observed him returning home several evenings, close to 6:00 P.M. Always there was the same slow passing of the house and turning off nearby. Toscano, as he said, on June 10, 1961, located the Moriarity 1956 black Buick on the street behind his house, near to a fence which leads to the back-yard of the place next door to him. Shortly thereafter Moriarity came from the direction of his residence, entered his car and drove away.

The facts noted by the agents reasonably give rise to their belief of a nightly collection by appellant of the policy slips which he then brought home where he tallied them, worked out the commissions and made ready the pay offs. The specialized knowledge of the agents, Moriarity's long connection with the particular form of wagering involved, his identical functioning with the same headquarters only ten months before, gave the agents probable grounds for their belief that Moriarity was using his home to conceal the necessary materials being used by him in conducting a numbers lottery.

The proof necessary to justify the warrant is that which shows probable

cause for a search, not what would be competent evidence upon a trial to prove appellant's guilt. All that was needed was a substantial foundation in the affidavits for the belief of the agents that Moriarity was using his home as his lottery headquarters with his various lottery equipment concealed therein. There is no hint here that the Commissioner doubted the agents' sworn statements. There is no contention that they were not true. Moriarity was, as represented by them, old in the numbers racket. He had conducted the same sort of illegal undertaking with his residence as a base within the year. The charge against him was " * * * much less subject to scepticism than would be such a charge against one without such a history." Jones v. United States, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960). As Chief Justice Stone said in Dumbra v. United States, 268 U.S. 435, 441, 45 S.Ct. 546, 549, 69 L.Ed. 1032 (1925):

> "We are concerned only with the question whether the affiant had reasonable grounds at the time of his affidavit and the issuance of the warrant for the belief that the law was being violated on the premises to be searched; and if the apparent facts set out in the affidavit are such that a reasonably discreet and prudent man would be led to believe that there was a commission of the offense charged, there is probable cause justifying the issuance of a warrant."

Appellant particularly relies upon United States v. Evans, 97 F.Supp. 95 (E.D. Tenn.N.D.1951). There the court found, 97 F.Supp. p. 97, "In the recited facts there is no support for probable cause to believe that in the dwelling house were being concealed distilling equipment and supplies. The recited facts suggest, rather, that the distilling equipment and supplies were at the still." There is a far different factual situation before us on this appeal.

The judgment of the district court will be affirmed.